308

48 A.3d 1009

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. ALFONSO
HERRERRA, DEFENDANT–RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. NELSON
GONZALEZ, DEFENDANT–RESPONDENT.

Argued April 25, 2012—Decided August 7, 2012.

310

*Paul H. Heinzel,* Deputy Attorney General, argued the cause for appellant (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney).

*Ruth Bove Carlucci,* Assistant Deputy Public Defender, argued the cause for respondents (*Joseph E. Krakora,* Public Defender, attorney; *Ms. Carlucci, Steven M. Gilson,* Designated Counsel and *Philip V. Largo,* Designated Counsel, on the briefs).

Chief Justice RABNER delivered the opinion of the Court.

In this case, we must decide whether defendants are entitled to racial profiling discovery to challenge their convictions for attempted murder. The convictions relate to defendants' attack on a law enforcement officer after a motor vehicle stop.

According to the evidence at trial, a New Jersey State Trooper stopped two Hispanic men for speeding on the New Jersey Turnpike in 1992. As the officer questioned the men immediately after the stop, they tried to overpower him. One defendant grabbed the officer around the neck and began to choke him, while the other tried to get control of the officer's firearm. During that struggle, the officer ultimately broke the second defendant's grip, retrieved his weapon, and fired twice, hitting the defendants. The police later obtained a search warrant for defendants' car and found about fourteen ounces of cocaine in it.

At trial, the State introduced the cocaine seized after the stop as evidence in support of all of the charges. Both defendants were convicted for drug charges as well as attempted murder and related offenses.

Years later, in a motion for post-conviction relief, defendants sought racial profiling discovery to prove that the stop was racially

motivated. After a series of rulings at the trial and appellate levels, the Attorney General dismissed the drug convictions, leaving only defendants' convictions for attempted murder and related offenses. Defendants now continue to press for profiling discovery to challenge the remaining convictions. They contend that they need the discovery to demonstrate that the drug evidence should have been suppressed.

That sequence of events raises the following question: whether the exclusionary rule applies to the prosecution of a violent attack on a police officer if the initial stop was unlawful.

The law can and must protect citizens from racial profiling at the same time it protects law enforcement officers from violent attacks in the field. Both are intolerable, and this case does not require us to choose between those principles.

When acts of racial profiling occur, there are very real legal consequences. To deter official misconduct, the exclusionary rule typically bars the use of any drugs seized after an unlawful stop in a prosecution for violating the drug laws. But extending the exclusionary rule to a prosecution for a violent attack on a police officer after an illegal stop would not serve any of the rule's purposes. Instead, such an approach would help immunize defendants for separate, deliberate, violent acts that are unrelated to the initial stop.

Because we conclude that the exclusionary rule does not apply in this case—to a prosecution for attempted murder after a possibly unlawful stop—there is no need for further discovery to determine whether the stop was in fact illegal. In short, defendants could not take the law into their own hands and later seek to suppress evidence in a prosecution for attempting to kill a trooper. Instead, they should have peacefully obeyed the officer's directions and tried to suppress the drugs in court.

Defendants also seek racial profiling discovery to challenge the trooper's credibility at a new trial. Under the rules of evidence, specific instances of conduct are generally inadmissible to attack a

witness's credibility at trial, aside from certain limited exceptions. Defendants offer no viable theory to use possible evidence of racial profiling at trial. We also note that the trial judge reviewed the trooper's personnel file and found "nothing whatsoever of a discoverable nature in the file."

For those reasons, we reverse the judgment of the Appellate Division directing that discovery be produced.

## I.

### A.

The State presented the following evidence. On August 16, 1992, Trooper David Acevedo of the New Jersey State Police was patrolling Route 78 in Warren County. At about 10:00 p.m., he saw a blue Pontiac driving at a high rate of speed. According to the Trooper's radar unit, the driver was traveling sixty-eight miles per hour in a fifty-five mile per hour zone.

The Trooper pulled the car over onto the shoulder of the road. Two men were in the front seats: defendant Herrerra had been driving, and defendant Gonzalez was in the passenger seat. The Trooper approached the driver's side and asked Herrerra for his license and registration. He produced a Missouri driver's license in the name of "Herrerra, Alfonso Lorenzo," with a Kansas City address. He could not find the car's registration but handed the Trooper a Pennsylvania title issued to "Lorenzo A. Herrera" of Reading, Pennsylvania. Thus, the first and middle names appeared in a different order on the documents; the last name was spelled differently with three or four "R's"; [1] and the documents listed different addresses.

---

[1] Defendant testified at trial that his last name is spelled "H-e-r-r-e-r-a." The case caption has used "H-e-r-r-e-r-r-a" since the 1990s. In any event, the two documents defendant supplied had different spellings that caught the Trooper's attention.

The Trooper directed Herrerra to get out of the car, and the two spoke behind the Pontiac. In response to the Trooper's questions, Herrerra said he had come from New York but could not remember from where specifically. When the Trooper asked about the passenger, Herrerra identified him as a friend whose name was "Nelson" but said he could not recall his last name.

The Trooper then approached the passenger and asked for identification. Gonzalez provided a Missouri driver's license with the same street address in Kansas City as defendant Herrerra's but a different apartment number. Gonzalez also said that he was traveling from New York but could not remember from where. The Trooper, by now concerned, asked Gonzalez to get out of the car, and the two continued speaking in front of the Pontiac. In response to a question about the driver, Gonzalez described him as a friend and identified him by a name other than what appeared on Herrerra's license and title.

At that point, the Trooper returned to Herrerra and asked for permission to search the Pontiac. Herrerra agreed to the request and said he preferred a consent form written in Spanish. The Trooper retrieved the form from the police car and called for backup. He then explained the consent form to Herrerra in Spanish. In response, Herrerra said he did not understand the form and wanted Gonzalez to explain it to him.

The Trooper continued to keep the men separate from each other and reviewed the form with Gonzalez behind the police car. Midway through the explanation, Herrerra began walking toward the Trooper while saying, "I'll sign it. I'll sign it." At that moment, Gonzalez grabbed the Trooper from behind in a "bear hug." Herrerra then charged the Trooper and grabbed him around the neck.

All three fell to the grassy part of the shoulder. The Trooper landed on top of Gonzalez, who tugged at the Trooper's weapon and tried to remove it from its holster. Meanwhile, Herrerra had his hands around the Trooper's neck and was choking him. During the struggle, the Trooper—who speaks Spanish—heard Gon-

zalez and Herrerra direct each other in Spanish: Gonzalez told Herrerra to choke the Trooper; and Herrerra urged Gonzalez to "get it"—referring to the gun. The Trooper pressed down on his weapon to prevent Gonzalez from getting hold of the gun, and eventually broke Gonzalez's grip. Once the Trooper retrieved the weapon from his holster, he fired two shots at the defendants. One round hit Herrerra in the buttocks. The other hit Gonzalez in the area of his right knee.

Herrerra fell to the ground, and Gonzalez began to run toward the Pontiac. The Trooper yelled at Gonzalez to stop and get down, and he complied. The Trooper then radioed for backup again and advised that shots had been fired. Soon after, other officers arrived and arrested Herrerra and Gonzalez. The two were taken to the hospital by ambulance.

The police obtained a search warrant for the Pontiac the following day. They found a little more than fourteen ounces of cocaine in the car, which had an estimated street value of about $40,000.

Defendants offered conflicting accounts of the incident. Herrerra testified at trial that he was stopped after driving sixty miles per hour. He stated that he gave the Trooper his license and title but refused to consent to a search of the car. According to Herrerra, the Trooper then spoke with Gonzalez. Afterward, the Trooper reportedly told Herrerra that "[w]hether you want to or not, I am going to search the car." In response, Herrerra said that he told the Trooper, "you are a mother * * * * * *. Do whatever you want to do, I'm not going to sign any paper and I turned around. And when I turned, he shot me." Herrerra added that he never touched the Trooper.

Herrerra also disputed testimony that Detective Nicholas Olenick offered. The Detective described meeting with Herrerra in the hospital two days after the incident on August 18, 1992. According to the Detective, after Herrerra waived his rights under *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), he relayed the following: the Trooper asked if there were

weapons in the car and asked Herrerra to sign a consent to search form; Herrerra was angry about being asked whether the steering wheel lock bar was a weapon; he asked for Gonzalez's assistance with the form and the two switched places; he returned soon after and told the Trooper to "go ahead and search, but if you don't find anything you will be in trouble"; the Trooper pushed him away with his clipboard; he responded by grabbing the Trooper by the chest; during the ensuing struggle, Gonzalez touched the Trooper's right shoulder; all three men slipped and fell to the ground; and the Trooper fired shots while Herrerra faced him nearby.

Herrerra repudiated the statement. At a pretrial hearing, he testified that he did not recall meeting the Detective or any police officers in the hospital. At trial, he denied ever speaking with the Detective. A nurse, however, testified that on August 18, 1992, two members of the State Police spent about two hours with Herrerra. The nurse did not witness the meeting but explained that Herrerra was alert, oriented, and cooperative that day. A sheriff's officer assigned to guard Herrerra in the hospital also testified that the meeting took place.

Gonzalez made a statement to the State Police on August 28, 1992, while in the Warren County Jail. He acknowledged that he knew about the cocaine in the car, which he said belonged to Herrerra. Gonzalez added that Herrerra initially pushed the Trooper but that neither he nor Herrerra attempted to take the Trooper's gun. When asked about cuts and bruises to the Trooper's neck and hand, Gonzalez replied that the Trooper must have done that to himself.

A grand jury in Warren County indicted both defendants on March 25, 1993. The charges addressed the cocaine found in the Pontiac as well as the attack on the Trooper. In particular, the indictment contained the following allegations: third-degree possession of cocaine, *N.J.S.A.* 2C:35–10(a)(1); first-degree possession of cocaine with intent to distribute, *N.J.S.A.* 2C:35–5(a)(1) & (b)(1); second-degree aggravated assault, *N.J.S.A.* 2C:12–1(b)(1); third-

degree aggravated assault, *N.J.S.A.* 2C:12–1(b)(2); third-degree aggravated assault on a police officer, *N.J.S.A.* 2C:12–1(b)(5); first-degree attempted murder, *N.J.S.A.* 2C:11–3(a)(1) & (2) & 2C:5–1; third-degree attempted unlawful possession of a handgun, *N.J.S.A.* 2C:39–5(b) & 2C:5–1; second-degree attempted possession of a handgun for an unlawful purpose, *N.J.S.A.* 2C:39–4(a) & 2C:5–1; third-degree criminal restraint, *N.J.S.A.* 2C:13–2; fourth-degree resisting arrest, *N.J.S.A.* 2C:29–2; and third-degree hindering apprehension or prosecution, *N.J.S.A.* 2C:29–3(b)(1).

Defendants filed various pretrial motions. They challenged the admissibility of their post-arrest statements, which the trial court admitted after a hearing. They also jointly moved to suppress the cocaine seized from the Pontiac. They argued that, even if the initial stop for speeding was lawful, their continued detention was illegal. In addition, defendants challenged the issuance of the search warrant. After conducting a hearing, the trial court concluded that defendants' detention was reasonable, and that the search warrant was supported by ample probable cause.

Defendants also moved pretrial for an in camera inspection of the Trooper's personnel file. They argued that evidence in the grand jury transcripts conflicted with the Trooper's version of the shooting and that there was a reasonable likelihood his personnel file would show bias, prejudice, a motive to fabricate, and proof of prior bad acts. The State opposed the motion and characterized it as a fishing expedition. The trial court granted the request, and the Appellate Division denied the State's motion for leave to appeal.

After oral argument, this Court asked the parties to supplement the record and explain what happened next. The Attorney General produced a letter from the trial court dated March 18, 1994, in which the judge wrote that he had conducted an in camera review of the Trooper's personnel file and found "nothing whatsoever of a discoverable nature in the file."

Each defendant had a separate jury trial in the summer of 1995. In addition to the facts recounted above, the State introduced

various items of evidence to corroborate the Trooper's account. Photographs of the Trooper taken hours after the incident depicted mud along the right-hand side of his pants, dirt on his right forearm, dirt and mud embedded in his holster, grass stuck in his shoes where the leather ties into the rubber soles, small cuts on his right hand, and bruises on the inside of his right elbow and throat. A photograph of Gonzalez's shirt showed mud on the back. Another photograph of Herrerra's pants showed grass, dirt, and blood stains. A photograph of the area near the rear of the police car revealed matted-down, trampled grass. In addition, a trooper who responded to the scene testified that Trooper Acevedo had visible injuries to his neck and appeared extremely shaken up and upset.

Both sides focused on the ballistics evidence at trial. The defense argued that the Trooper shot Herrerra in the back from a distance of four to five feet, contrary to the Trooper's testimony; the State claimed the bodies were likely in a flex position, as the Trooper described. In summation, both defense attorneys and the prosecutor made passing references to racial profiling.

Both defendants were convicted of attempted murder, first-degree possession of cocaine with intent to distribute, aggravated assault, possession of cocaine, aggravated assault on a police officer, attempted possession of a handgun for an unlawful purpose, attempted unlawful possession of a handgun, criminal restraint, and hindering apprehension and prosecution. Herrerra was also convicted of third-degree aggravated assault and speeding. Gonzalez was acquitted of third-degree aggravated assault but convicted of the lesser-included offense of simple assault.

The judge sentenced each defendant to twenty years' imprisonment with a ten-year period of parole ineligibility for attempted murder, and to consecutive terms of twenty years' imprisonment with a seven-year period of parole ineligibility for possession of cocaine with intent to distribute. The court imposed concurrent sentences on the remaining counts that did not merge.

Defendants appealed, and the Appellate Division affirmed their convictions and sentences. The panel also rejected defendants' challenge to the denial of their motions to suppress the cocaine. This Court denied defendants' petitions for certification. 156 *N.J.* 406, 719 *A.*2d 638 (1998).

### B.

Defendants filed separate actions for post-conviction relief (PCR) in 1999. Among other issues, they alleged that they were victims of racial profiling and had been subjected to an unlawful stop. The trial judge referred defendants' motion for discovery on that claim to Judge Walter R. Barisonek—whom this Court had previously designated to oversee all racial profiling discovery claims against the State Police.

Judge Barisonek denied the discovery request on May 3, 2002. He reasoned that even if the Trooper had "profiled" the defendants, their independent behavior afterward was sufficiently attenuated from any unlawful stop to allow the drugs to be admitted at trial. *State v. Gonzalez*, 382 *N.J.Super.* 27, 35, 887 *A.*2d 704 (App.Div.2005). He also rejected defendants' argument that the discovery was relevant on credibility grounds; he explained that the evidence was "not significant" in light of defendants' intervening acts and *N.J.R.E.* 403. *Id.* at 38, 887 *A.*2d 704. The original trial judge then denied both PCR petitions.

Defendants appealed, and the Appellate Division reversed on the discovery issue. *Id.* at 43, 887 *A.*2d 704. The panel evaluated the request against the backdrop of the attenuation doctrine— whether defendants' conduct after the stop created a sufficient break in the chain of events to avoid suppression. *Id.* at 35, 887 *A.*2d 704. The panel reasoned as follows:

> It seems to us that there is a significant difference in the PCR proceedings here, between defendants' potential suppression argument respecting their drug convictions and the argument respecting the attempted murder and related convictions. Our concern for the safety of all law enforcement officers, even those who may have engaged in the offensive practice of racial profiling, requires us to disavow any suggestion that a person who is stopped by police, irrespective of a sincere

belief that he or she has been selectively targeted based upon improper factors, has the right to respond with force or resistance.

Even if evidence seized after defendants' arrest and authorized by a search warrant would be admissible on the attempted murder and other charges arising out of defendants' conduct after the stop, application of the exclusionary rule would be less clear with respect to the drug charges.

[*Id.* at 40–41, 887 *A.*2d 704.]

The panel therefore ordered disclosure of the "trooper's history and any other relevant information," to be determined by Judge Barisonek. *Id.* at 41, 887 *A.*2d 704. Until the trial court could review that discovery, the panel concluded, "it is premature for us to decide whether the stop is sufficiently attenuated to uphold admission of the challenged evidence with respect to any of defendants' convictions." *Ibid.*

This Court denied the State's petition for certification. 192 *N.J.* 291, 927 *A.*2d 1290 (2007). Months later, in December 2007, the Attorney General superseded the Warren County Prosecutor and moved to vacate the drug convictions against both defendants. Without conceding that racial profiling occurred in this case, the Attorney General explained that in the interest of justice, it was time to move forward and not litigate profiling issues from the past. The trial judge dismissed the drug convictions with prejudice and held that defendants were no longer entitled to racial profiling discovery on the remaining counts. The court also dismissed defendants' other PCR claims.

Defendants appealed. They argued that the Appellate Division's previous decision in 2005 entitled them to profiling discovery related to all of their convictions. Notwithstanding dismissal of the drug counts, defendants asserted that they were entitled to a new trial and that racial profiling discovery would be useful in attacking the credibility of the Trooper.

The Appellate Division again reversed. The panel concluded that the PCR judge "fail[ed] to comply with our earlier mandate" and "mistakenly assumed the State's attenuation theory could be determined on its merits without turnover of the mandated discovery." The panel stressed that a decision on attenuation was

"premature" and that nothing in its earlier decision rested on the "continued viability of the drug convictions." The panel also noted that, even if the attenuation doctrine were ready to be considered, the trial judge had not analyzed the required factors and had not addressed whether racial profiling discovery "would have been admissible at trial to challenge the trooper's credibility." The court remanded the case for entry of an order compelling the State to turn over racial profiling discovery and for further proceedings.

We granted the State's petition for certification. 207 *N.J.* 64, 22 *A.*3d 973 (2011).

## II.

The Attorney General maintains that the exclusionary rule cannot be used to suppress evidence related to a violent attack on a police officer during a traffic stop, even if the initial stop was unlawful. In light of the dismissal of defendants' drug convictions, all that remains in this case are convictions for attempted murder and related offenses. As a result, the Attorney General argues, the exclusionary rule no longer applies. He therefore contends that the attenuation doctrine is also irrelevant, because it presupposes that the exclusionary rule can be invoked and possibly lead to the suppression of evidence.

In support of this position, the Attorney General cites to other jurisdictions that have adopted a new crime exception and decline to apply the exclusionary rule to crimes like assault, attempted murder, and murder of a police officer. The Attorney General also relies on *State v. Crawley*, 187 *N.J.* 440, 901 *A.*2d 924 (2006), and *State v. Battle*, 256 *N.J.Super.* 268, 606 *A.*2d 1119 (App.Div.), *certif. denied*, 130 *N.J.* 393, 614 *A.*2d 616 (1992).

The Attorney General recognizes that racial profiling discovery might be available in a case like *State v. Lee*, 190 *N.J.* 270, 920 *A.*2d 80 (2007), in which a defendant challenged convictions for assault on a police officer as well as drug offenses. In that situation, the Attorney General notes that discovery might shed light on the attenuation analysis that would apply to the drug charges.

The Attorney General also argues that defendants are not entitled to racial profiling discovery for the purpose of attacking the Trooper's credibility at trial. The Attorney General maintains that the rules of evidence bar that approach, that the type of material Judge Barisonek typically ordered disclosed has little bearing on an individual officer's credibility, and that introduction of such evidence would overwhelm the proceedings and confuse the issues. The Attorney General also highlights evidence that corroborated the Trooper's account at trial.

In addition, the Attorney General represents that Herrerra and Gonzalez are the last defendants to claim racial profiling discovery, and that the Office dismissed their drug convictions in an effort to bring that history to a close. For those and other reasons, the Attorney General urges this Court to reverse the judgment of the Appellate Division.

Defendants primarily argue that they are entitled to the racial profiling discovery that two panels of the Appellate Division have ordered. They emphasize that they have presented a colorable claim of selective enforcement that justifies those decisions. In addition, they contend that it is premature under *Lee* to conduct any attenuation analysis before discovery is provided. They argue that the Court in *Lee* did not limit its holding to the drug charges in the case, and that the State cannot bypass discovery by dismissing defendants' drug convictions.

In addition, defendants claim that they are entitled to profiling discovery in any event to challenge the Trooper's credibility at a new trial. At oral argument, defendants submitted that the evidence might be admissible as proof of other crimes, wrongs, or acts under *Rule* 404(b), or prior false accusations under *Rule* 608(b), if the current rule were expanded.

### III.

We consider defendants' request for racial profiling discovery in light of the history of that issue. In 1996, Judge Robert E.

Francis ruled on motions to suppress filed by seventeen African-American defendants who asserted that they were victims of racial profiling. After a lengthy hearing, Judge Francis found that the defendants had established a prima facie case of selective enforcement by the State Police and had proven a de facto policy of targeting African-Americans for investigation and arrest on parts of the New Jersey Turnpike from April 1988 to May 1991. *State v. Soto*, 324 *N.J.Super.* 66, 69, 84, 734 *A.2d* 350 (Law Div.1996).

The Attorney General investigated State Police practices on the Turnpike and issued an Interim Report in April 1999. The report acknowledged that the great majority of state troopers are honest, dedicated professionals but recognized that "the problem of disparate treatment is real not imagined." Att'y Gen. N.J., *Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling* 3–4 (1999). The report concluded that "minority motorists have been treated differently" in traffic stops on the Turnpike and initiated a series of reform measures in response. *Id.* at 4, 86–111.

Later that year, the State entered into a consent decree with the United States Department of Justice. Among other things, the decree referenced recommendations in the Interim Report and other remedial steps taken by the State Police, detailed various requirements for motor vehicle stops to ensure non-discriminatory conduct, and established an independent monitor to report on the implementation of the decree.

The decree remained in effect until September 2009. After two independent monitors reported substantial and uninterrupted compliance for the forty-five months from early 2004 through December 2007, and after a series of public hearings conducted by the Advisory Committee on Police Standards, a federal judge granted the parties' joint application for termination of the consent decree.

Also, in August 2009, the Legislature enacted the Law Enforcement Professional Standards Act. *See N.J.S.A.* 52:17B–222 to –236. The law acknowledged that many of the reforms accom-

plished during the consent decree had been codified by the Superintendent of the State Police, *N.J.S.A.* 52:17B–223(e), directed that future changes could only be made with the approval of the Attorney General, *ibid.*, and established an Office of Law Enforcement Professional Standards to carry out investigative, policy and training oversight, and monitoring activities, *N.J.S.A.* 52:17B–225.

During the above period, there were simultaneous developments in the court system. Defendants in multiple criminal cases raised allegations of racial profiling by the State Police and sought discovery related to that issue. In response to a request from the Attorney General, this Court entered an Administrative Determination and Order on January 31, 2000 to coordinate the management of those cases on a statewide basis. As noted above, the Court designated Judge Barisonek as the single judge to hear all motions for discovery related to racial profiling. The Court also stayed the motions until certain pending appeals were resolved.

The Appellate Division decided those appeals in June 2000. In a decision that addressed three consolidated cases, Judge Edwin H. Stern, then-P.J.A.D., explained that "a defendant must establish a colorable basis for a claim of selective enforcement in order to obtain pretrial discovery" related to racial profiling. *State v. Ballard*, 331 *N.J.Super.* 529, 541, 752 *A.2d* 735 (App.Div.2000) (quoting *State v. Kennedy*, 247 *N.J.Super.* 21, 25, 588 *A.2d* 834 (App.Div.1991)). The panel concluded that the defendants in all three cases before it had satisfied that threshold based on the "decision of the Law Division in *Soto, supra,* the *Interim Report,* and the lack of any presentation of facts that indicated a change in the policy or practice of the State Police between the *Soto* decision of March 1996 and the *Interim Report* of April 1999." *Id.* at 542–43, 752 *A.2d* 735. Absent proof by the State to rebut a colorable claim and show that a stop was non-discriminatory, defendants may obtain discovery. *Id.* at 560, 752 *A.2d* 735. The panel also offered some general guidance, *id.* at 550–60, 752 *A.2d* 735, and remanded the three cases to Judge Barisonek "to develop uniform

policies and procedures" for racial profiling discovery, *id.* at 561, 752 *A.*2d 735.

In a series of orders, Judge Barisonek directed that defendants perceived to be African–American or Hispanic–American were entitled to discovery for motor vehicle stops by State Troopers from January 1, 1988 through April 20, 1999 on the Turnpike, its extensions, Routes 80 and 78, the Garden State Parkway, and other interstate roads. The State agreed that a colorable basis for discovery existed in those cases. In orders dated November 28, 2001 and February 20, 2002, Judge Barisonek specifically required disclosure of random stop data for 1200 stops per year for different trooper stations for a period spanning several years, disclosure of individual trooper stop/arrest data for 100 to 300 stops for two years before a particular stop in question in a criminal case, consent search data, and complaints of racial profiling, among other items.[2] The categories of information in the order presuppose their use at a suppression hearing or pretrial motion on selective enforcement, at which time defendants could challenge the legality of a stop or raise a claim of selective prosecution. *See State v. Ball,* 381 *N.J.Super.* 545, 561, 887 *A.*2d 174 (App.Div.2005) ("There is no dispute that racial profiling violates due process . . . ." (internal quotation marks and citation omitted)); *see also United States v. Armstrong,* 517 *U.S.* 456, 464, 116 *S.Ct.* 1480, 1486, 134 *L.Ed.*2d 687, 698 (1996) (deciding to prosecute based on race violates defendant's due process rights).

In 2001, after the release of the Interim Report, the filing of numerous claims across the State, and the decision in *Ballard,* the Attorney General moved to dismiss seventy-seven cases pending before Judge Barisonek. The next year, the Office moved to dismiss an additional eighty-six cases in which defendants were entitled to racial profiling discovery—the remaining matters be-

---

[2] At oral argument, the State represented that it made tens of thousands of documents about racial profiling available to the public and the Legislature in 2000, including training materials but not raw data about individual stops.

fore Judge Barisonek in which defendants had a colorable basis to claim selective enforcement. Rather than litigate those claims, the Attorney General's Office explained that it sought dismissal in the interests of justice in an effort to move forward. Judge Barisonek granted both motions and noted in 2002 that the request for dismissal constituted "an extraordinary act of discretion ... to help alleviate this problem and help confront this issue head on." The Attorney General offered the same reasons in support of its motion to dismiss the drug charges against Herrerra and Gonzalez. The Office submits that these are the last defendants to seek racial profiling discovery.

## IV.

Defendants' discovery request arises in the context of a petition for post-conviction relief. The scope of permissible discovery at that stage is limited. "[O]nly in the unusual case will a PCR court invoke its inherent right to compel discovery." *State v. Marshall,* 148 *N.J.* 89, 270, 690 *A.*2d 1, *cert. denied,* 522 *U.S.* 850, 118 *S.Ct.* 140, 139 *L.Ed.*2d 88 (1997).

As this Court has explained, "[t]he filing of a petition for PCR is not a license to obtain unlimited information from the State, but a means through which a defendant may demonstrate to a reviewing court that he was convicted or sentenced in violation of his rights." *Ibid.* (citing *R.* 3:22-2). As a result, "any PCR discovery order should be appropriately narrow and limited." *Ibid.* (citations omitted). This Court has also directed that unless there are exceptional circumstances, "a defendant seeking to inspect State files should identify the specific documents sought for production." *Id.* at 271, 690 *A.*2d 1. A PCR judge may view those documents in camera before deciding whether to order their disclosure. *Ibid.* The PCR judge's discovery order is reviewed on appeal for abuse of discretion. *See id.* at 272, 690 *A.*2d 1.

To obtain PCR relief, defendants must carry "the burden of proving that barring the petition would lead to injustice." *State*

*v. Mitchell*, 126 *N.J.* 565, 587, 601 *A.*2d 198 (1992) (citation omitted). To make that assessment, "courts will look to whether the judicial system has provided the defendant with fair proceedings leading to a just outcome." *Ibid.* Although a defendant need not prove that "the issue of concern cost him the case, . . . 'there should at least be some showing that . . . [the alleged violation] played a role in the determination of guilt.' " *Ibid.* (alteration in original) (internal citation omitted).

In this PCR proceeding, defendants seek full racial profiling discovery and, potentially, a new trial. Even at this late stage, though, the precise scope of their request is unclear. At oral argument, defendants asked for Trooper Acevedo's personnel file, raw data relating to his road stops over the years, and the discovery "relevant in all cases" to show the practice of racial profiling by the State Police more generally. Presumably, that would include data about stops and arrests by other troopers. When pressed, defendants declined to limit the scope of their request. Defendants argue that this information is necessary to evaluate the attenuation theory and challenge Trooper Acevedo's credibility at a new trial.

## V.

Because petitioners' drug convictions have been dismissed, it is no longer necessary to determine whether drugs seized during a possibly unlawful stop should have been excluded in a prosecution for *drug* charges. Instead, the remaining threshold question is whether the exclusionary rule applies to evidence of a violent attack against a police officer after an unlawful stop.[3] If the rule applies, and if the stop was in fact illegal, it would be necessary to consider whether defendants' later conduct was sufficiently attenuated from the unlawful stop such that suppression is not required.

---

[3] At times in this opinion, we refer to the drug offense as the "primary" offense, to distinguish it from the offense committed after the stop, such as an attack on an officer.

If the exclusionary rule does not apply altogether, those additional steps are unnecessary.

Defendants primarily focus on their need for racial profiling discovery to establish that the stop in this case was illegal and to frame their position on the attenuation theory. They presume that the illegal nature of a stop could require suppression of evidence in a trial for attempted murder. We begin with that question, and start with certain basic principles about the exclusionary rule.

The exclusionary rule generally bars the State from introducing evidence of the "fruits" of an illegal search or seizure. *State v. Badessa*, 185 *N.J.* 303, 311, 885 *A.*2d 430 (2005) (quoting *Wong Sun v. United States*, 371 *U.S.* 471, 485, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 454 (1963)). The rule serves a number of important purposes: to deter misconduct by the police and thereby guarantee the protections provided by the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution, *see United States v. Calandra*, 414 *U.S.* 338, 347, 94 *S.Ct.* 613, 619–20, 38 *L.Ed.*2d 561, 571 (1974); *Badessa, supra*, 185 *N.J.* at 310, 885 *A.*2d 430; to ensure that police do not "profit" from lawless behavior, *see State v. Evers*, 175 *N.J.* 355, 376, 815 *A.*2d 432 (2003) (citation omitted); and to preserve the integrity of the courts by not providing a forum for tainted evidence, *see Terry v. Ohio*, 392 *U.S.* 1, 12–13, 88 *S.Ct.* 1868, 1875, 20 *L.Ed.*2d 889, 901 (1968); *State v. Williams*, 192 *N.J.* 1, 14, 926 *A.*2d 340 (2007); *State v. Johnson*, 118 *N.J.* 639, 651, 573 *A.*2d 909 (1990).

Courts apply the exclusionary rule "to those circumstances where its remedial objectives can best be achieved." *Williams, supra*, 192 *N.J.* at 15, 926 *A.*2d 340 (citing *Calandra, supra*, 414 *U.S.* at 348, 94 *S.Ct.* at 620, 38 *L.Ed.*2d at 571). Sometimes, the cost of excluding evidence is not justified by the rule and its purposes. *See Badessa, supra*, 185 *N.J.* at 311, 885 *A.*2d 430 (citing *United States v. Leon*, 468 *U.S.* 897, 910–11, 104 *S.Ct.* 3405, 3414, 82 *L.Ed.*2d 677, 690–91 (1984)).

 The attenuation doctrine is an example of an exception to the exclusionary rule. *Ball, supra,* 381 *N.J.Super.* at 550 n. 1, 887 *A.*2d 174. The doctrine examines whether the connection between the constitutional violation and the evidence is "'so attenuated as to dissipate the taint' from the unlawful conduct." *Badessa, supra,* 185 *N.J.* at 311, 885 *A.*2d 430 (quoting *Nardone v. United States,* 308 *U.S.* 338, 341, 60 *S.Ct.* 266, 268, 84 *L.Ed.* 307, 312 (1939)). To assess whether evidence is sufficiently attenuated, courts consider three factors: "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct." *Johnson, supra,* 118 *N.J.* at 653, 573 *A.*2d 909 (citing *Brown v. Illinois,* 422 *U.S.* 590, 603–04, 95 *S.Ct.* 2254, 2261–62, 45 *L.Ed.*2d 416, 427 (1975); *State v. Barry,* 86 *N.J.* 80, 87, 429 *A.*2d 581, *cert. denied,* 454 *U.S.* 1017, 102 *S.Ct.* 553, 70 *L.Ed.*2d 415 (1981)) (additional citations omitted).

*Battle* addressed a number of those concerns in a similar factual context. The defendant in *Battle* was arrested after a traffic stop. Although the officer had a right to stop the defendant's car because it had no license plates, there was no basis to continue the detention after the officer saw a temporary registration tag in the rear window. *Battle, supra,* 256 *N.J.Super.* at 273–74, 606 *A.*2d 1119. Nonetheless, after spotting rolling paper and a plastic bag, the officer ordered the defendant and two occupants out of the car, patted them down, and removed the bag from inside the car. *Id.* at 273, 606 *A.*2d 1119. The bag contained what appeared to be marijuana. *Ibid.* In response, the officer told all three individuals that they were under arrest. *Ibid.*

One of the individuals immediately started to flee; the defendant meanwhile got back into the car and began to drive away. *Ibid.* The officer jumped into the passenger side of the car and tried to turn off the ignition. *Ibid.* As the car traveled at about forty miles per hour, the two men struggled until the defendant pushed the officer out of the car onto the middle of the highway. *Ibid.* The officer broke his foot and suffered other injuries. *Ibid.*

The defendant surrendered days later, but the police never recovered the plastic bag. *Ibid.*

The defendant was charged with two drug offenses, aggravated assault on a police officer, and escape. *Id.* at 272, 606 *A.*2d 1119. He moved to suppress the officer's statements about the marijuana reportedly found in the car. *Ibid.* The trial court suppressed that testimony as to the drug charges but allowed the State to present it in connection with the aggravated assault and escape charges. *Id.* at 273–74, 606 *A.*2d 1119. The State then moved to dismiss the drug charges and obtained convictions at trial for aggravated assault and resisting arrest, a lesser-included offense. *Id.* at 272, 606 *A.*2d 1119.

On appeal, the Appellate Division affirmed the suppression order. Judge Stephen Skillman, J.A.D., writing for the panel, explained that "extending the fruits of the poisonous tree doctrine to immunize a defendant from prosecution for new crimes committed after police misconduct would give a criminal suspect 'an intolerable *carte blanche* to commit further criminal acts.' " *Id.* at 274, 606 *A.*2d 1119 (quoting *State v. Casimono*, 250 *N.J.Super.* 173, 184, 593 *A.*2d 827 (App.Div.1991), *certif. denied*, 127 *N.J.* 558, 606 *A.*2d 370 (1992)). To apply the exclusionary rule in those circumstances, the panel continued, would reach too far and be " 'too high a price for society to pay in order to deter police misconduct.' " *Ibid.* (quoting *Casimono, supra*, 250 *N.J.Super.* at 184, 593 *A.*2d 827 (quoting *United States v. Bailey*, 691 *F.*2d 1009, 1017 (11th Cir.1982), *cert. denied*, 461 *U.S.* 933, 103 *S.Ct.* 2098, 77 *L.Ed.*2d 306 (1983))). The panel reasoned that suppression would also undermine the "truth seeking function" of the trial and leave "gaps in the jury's understanding of the chain of events." *Id.* at 276, 606 *A.*2d 1119 (citing *James v. Illinois*, 493 *U.S.* 307, 311, 110 *S.Ct.* 648, 651, 107 *L.Ed.*2d 676, 683 (1990)).

The panel then addressed the core purpose of the exclusionary rule and concluded that admitting the evidence to prosecute the aggravated assault and escape charges would not encourage police misconduct. *Id.* at 277, 606 *A.*2d 1119. Rather, it noted that

suppression in connection with the drug offenses provided an "adequate deterrent" because the aim of the "unlawful search was to discover drugs, not to precipitate defendant's violent response to his arrest." *Ibid.* (citation omitted).

Thus, the court in *Battle* did not apply the exclusionary rule to the aggravated assault and escape charges. It also did not conduct an attenuation analysis to reach that conclusion.

Many other jurisdictions have followed a similar approach when the response to an unlawful arrest or seizure has been a physical attack or threat of violence against an officer. *See* 6 Wayne R. LaFave, *Search and Seizure* § 11.4(j), at 377–78 (4th ed. 2004) (discussing cases). In fact, numerous courts, like the Appellate Division in *Battle*, have declined to apply the exclusionary rule to the prosecution of a defendant's violent response because "[a]pplication of the exclusionary rule ... would in effect give the victims of illegal searches a license to assault and murder the officers involved—a result manifestly unacceptable," *State v. Miller*, 282 *N.C.* 633, 194 *S.E.*2d 353, 358 (1973) (interpreting statutory and constitutional exclusionary rules). Also, as Professor LaFave notes in his treatise on the Fourth Amendment, when a defendant commits a new crime, "no exploitation of the prior illegality is involved" so "the rationale of the exclusionary rule does not justify its extension." LaFave, *supra*, § 11.4(j), at 378.

Courts have repeatedly declined to apply the exclusionary rule in the prosecution of an attack or threatened attack on an officer after a constitutional violation. *See, e.g., United States v. Sprinkle*, 106 *F.*3d 613, 619 (4th Cir.1997) (holding that firing of gun at officer after initial unlawful stop triggered exception to exclusionary rule); *Napageak v. State*, 729 *P.*2d 893, 895 (Alaska Ct.App. 1986) (declining to apply exclusionary rule to assault charges for brandishing whale gun against officer after illegal entry); *State v. White*, 642 *So.*2d 842, 844 (Fla.Dist.Ct.App.1994) (declining to suppress evidence in prosecution for attempted murder of officers when defendants fired shots during execution of illegal search warrant); *People v. Villarreal*, 152 *Ill.*2d 368, 178 *Ill.Dec.* 400, 604

*N.E.*2d 923, 928 (1992) (declining to apply exclusionary rule to suppress evidence of aggravated battery regardless of legality of officers' entry into home); *Commonwealth v. Johnson*, 245 *S.W.*3d 821, 824–25 (Ky.Ct.App.2008) (declining to apply exclusionary rule to evidence of assault on officer, even if officer's entry illegal); *State v. Panarello*, 157 *N.H.* 204, 949 *A.*2d 732, 736–37 (2008) (joining "overwhelming weight of authority" in declining to apply exclusionary rule to evidence that defendant pointed gun at police officer after unlawful entry); *Miller, supra*, 194 *S.E.*2d at 358 (holding that exclusionary rule "does not require exclusion of evidence obtained after an illegal entry when that evidence is offered to prove the murder of one of the officers making the entry"); *State v. Mierz*, 127 *Wash.*2d 460, 901 *P.*2d 286, 294 (1995) (declining to apply exclusionary rule to suppress evidence of defendant's attack on wildlife officers even if entry and arrest was unlawful); *see also State v. Boilard*, 488 *A.*2d 1380, 1386–87 (Me.1985) (holding that exclusionary rule did not extend to suppress evidence of assault against officer after unlawful police entry). The decisions did not employ an attenuation analysis. *But see State v. Bale*, 267 *N.W.*2d 730, 733 (Minn.1978) (applying attenuation factors).[4]

■ We also rely on a related line of case law that established the following basic principle: suspects must obey a police officer's commands during an investigatory stop, even if the stop is unlawful, and test the stop and detention later in court. It is well-

---

[4] Other cases, whose holdings we do not rely on, would allow evidence from an unlawful search or arrest to be used to prosecute the primary offense as well, without an attenuation analysis. In other words, in a case in which an officer unlawfully stopped a defendant and found drugs, and the defendant attacked the officer during the stop, some courts would allow the drug evidence to be used in a prosecution for drug charges without performing the three-factor attenuation test. *See, e.g., United States v. King*, 724 *F.*2d 253, 256 (1st Cir.1984); *Bailey, supra*, 691 *F.*2d at 1017; *State v. Lusby*, 146 *Idaho* 506, 198 *P.*3d 735, 739 (Idaho Ct.App.2008). In our judgment, it is necessary to conduct an attenuation analysis in those circumstances and determine if the defendant's behavior—the attack on the officer—purged the taint from the unconstitutional stop. *See Williams, supra*, 192 *N.J.* at 15–18, 926 *A.*2d 340.

settled that defendants have "no right" to resist arrest, elude or obstruct the police, or escape "in response to an unconstitutional stop or detention." *Crawley, supra,* 187 *N.J.* at 455, 901 *A.*2d 924. "For compelling public safety reasons," the law requires "that a defendant submit to an illegal detention and that he take his challenge to court." *Ibid.* Even though the suspect may have done nothing wrong, "he cannot be the judge of his own cause and take matters into his own hands and resist or take flight. The proper forum to challenge supposed unlawful police conduct is in court." *Id.* at 459-60, 901 *A.*2d 924 (citation omitted). The Court reaffirmed those principles in *Williams,* when it explained that a "defendant was obliged to submit to [an] investigatory stop, regardless of its constitutionality." *Williams, supra,* 192 *N.J.* at 10, 926 *A.*2d 340.

In *Williams,* the police approached two men in response to a tip that an African–American male wearing a black jacket was selling drugs at a particular address. *Id.* at 4-5, 926 *A.*2d 340. Both men were at the location wearing black jackets. *Id.* at 5, 926 *A.*2d 340. The police did not pursue one man who left the scene without arousing any suspicion, but asked the defendant to place his hands on his head. *Ibid.* He pushed the officer and fled instead, and the police found a handgun in his waistband when they arrested and handcuffed him. *Ibid.*

On appeal, the defendant challenged his convictions for weapons offenses. (He had been acquitted of obstruction at trial.) He claimed that the seizure of the handgun stemmed from an unconstitutional stop and thus should have been suppressed. *Id.* at 8, 926 *A.*2d 340. The Court noted that if the defendant had "merely stood his ground and resorted to the court for his constitutional remedy, then the unlawful stop would have led to the suppression of the handgun." *Id.* at 17, 926 *A.*2d 340 (citation omitted). However, the Court held that because defendant's resistance and flight purged the taint from any unconstitutional stop, the exclusionary rule did not apply. *Id.* at 18, 926 *A.*2d 340.

To reach that conclusion, the *Williams* Court properly conducted an attenuation analysis. Unlike the matter before us now, the defendant in *Williams* appealed his convictions for weapons offenses. The handgun the police seized was used to convict him of the primary offense—possession of contraband the police found on him. Even if the defendant had attacked the officers during the stop as part of another offense, it still would have been necessary to evaluate the admissibility of the handgun under the exclusionary rule with regard to the primary weapons charges.

The Court went on to apply the familiar attenuation factors. In the end, the Court held that the defendant's act of obstruction constituted a break in the chain from the investigatory stop, and that the handgun was therefore admissible to prosecute the weapons case as evidence seized incident to a lawful arrest for obstruction. *Id.* at 10, 18, 926 *A.*2d 340. There was no need for this Court to address whether the handgun was admissible to prosecute crimes committed after the stop, or how the exclusionary rule would apply under those circumstances. *Cf. Johnson, supra,* 118 *N.J.* at 658, 573 *A.*2d 909 (applying attenuation analysis to determine whether "the fact of [defendant's] escape" could be used "in his trial for murder"—the primary offense).

In light of the above principles, we conclude that the exclusionary rule does not apply to evidence of defendants' attempt to murder Trooper Acevedo, regardless of the legality of the initial stop. It is not necessary to adopt a "new crime exception," as some jurisdictions have done, to reach that conclusion. Instead, we rely on the principles outlined in *Battle, Crawley,* and *Williams,* as well as the rationale of the exclusionary rule.

When the Trooper ordered Herrerra and Gonzalez out of their car, they were obligated to comply peacefully. Had they done so, they could have challenged the cocaine seized from their car in court and pursued a claim of racial profiling then. But nothing about the legality of the stop can in any way excuse their response—a violent attack on the Trooper in an attempt to take his life.

Even if the initial stop was unlawful, there is no basis to extend the exclusionary rule to defendants' prosecution for attempted murder and related offenses. Any misconduct by the police would be sufficiently deterred by suppressing the cocaine in a prosecution for drug charges. That would remove any profit from unconstitutional behavior and any incentive for the police to disregard the law.

To go beyond that, though, and suppress the drug evidence at a trial for attempted murder, would in effect help immunize a defendant's lawless acts of violence and deprive the jury of learning about the motive for the attack. And suppression would not in any way discourage official misconduct in this regard; it is illogical to suggest that police officers need to be deterred from provoking violent attacks against themselves. Finally, as to the exclusionary rule's overriding concern to preserve the integrity of the courts and the public's trust in government, it is difficult to see how a rule of law that might bar relevant evidence at a trial for attempted murder of a police officer, after an unlawful stop, would enhance trust and respect for the courts.

To be sure, the situation might well have been different if Herrerra and Gonzalez had obeyed the Trooper's commands. They would likely be entitled to racial profiling discovery under *Ballard* and Judge Barisonek's orders, which might have provided a basis to bar the drug evidence at a new trial for *drug*-related offenses. By taking the law into their own hands, though, defendants changed the legal landscape. Their deliberate, violent conduct led to additional charges for attempted murder and other crimes to which the exclusionary rule does not apply.

For that reason, it is not necessary to conduct an attenuation analysis. Although a number of published decisions apply that analysis in the face of a constitutional violation, none of them involved only the prosecution of separate, violent attacks on a police officer. *See, e.g., Williams, supra,* 192 *N.J.* at 15–18, 926 *A.*2d 340; *Johnson, supra,* 118 *N.J.* at 654–59, 573 *A.*2d 909. Because the exclusionary rule does not apply, there is no need to

use the three-factor attenuation test. As a result, this Court's opinion in *Lee, supra,* 190 *N.J.* at 282–83, 920 *A.*2d 80—which states that it is premature to conduct an attenuation analysis before racial profiling discovery is provided and assessed—does not apply either. *Lee* involved a defendant's challenge to convictions for drug crimes as well as offenses committed after a possibly unlawful stop—not just the latter type of offense. *Id.* at 273–74, 920 *A.*2d 80.

In short, because the exclusionary rule does not apply to the charges of attempted murder and related offenses remaining in this case, defendants are not entitled to racial profiling discovery in an effort to try to suppress the drug evidence.

## VI.

We turn next to defendants' other reason for seeking racial profiling discovery: to challenge Trooper Acevedo's credibility at a new trial. In that regard, we are mindful of the limits on discovery during PCR proceedings, *see Marshall, supra,* 148 *N.J.* at 270, 690 *A.*2d 1, and the limits the rules of evidence place on using specific instances of conduct to challenge a witness's credibility.

The type of discovery envisioned by *Ballard* and Judge Barisonek's orders—random stop data for different trooper stations, stop and arrest data for individual troopers for 100 to 300 stops *before* the stop in question, consent search data, complaints of racial profiling, and other items—can be relevant at a suppression hearing and may enable defendants to build a case of selective enforcement. But a claim of selective prosecution "is not a defense on the merits to the criminal charge." *Ballard, supra,* 331 *N.J.Super.* at 539, 752 *A.*2d 735 (quoting *Armstrong, supra,* 517 *U.S.* at 463, 116 *S.Ct.* at 1486, 134 *L.Ed.*2d at 698). The claim is directed to the court, not a jury. *See Wayte v. United States,* 470 *U.S.* 598, 607–08, 105 *S.Ct.* 1524, 1530–31, 84 *L.Ed.*2d 547, 556 (1985) (discussing court's role in assessing claim of selective prosecution); *State v. DiFrisco,* 118 *N.J.* 253, 266, 571 *A.*2d 914

(1990) (same). As a result, these theories do not support the use of racial profiling materials at trial to challenge an officer's credibility.

Defendants' written submissions did not identify the precise discovery they seek or any evidentiary rules that would support using racial profiling discovery to challenge the Trooper at trial. At oral argument, defendants pressed for access to the Trooper's personnel file, raw data underlying his stops, and more global information about racial profiling by the State Police generally—presumably data on other troopers' stops and their training. In response to questions from the Court, defendants argued that the materials might be admissible under *N.J.R.E.* 404(b) or *N.J.R.E.* 608(b) to attack the Trooper's credibility and his motive for stopping defendants.

█ Specific instances of conduct to attack a witness's credibility are generally inadmissible, aside from proof of a prior conviction under *N.J.R.E.* 609 and particular evidence of prior false accusations under *N.J.R.E.* 608(b). *See N.J.R.E.* 405(a) (reputation or opinion evidence to prove character); *N.J.R.E.* 405(b) (limiting evidence of specific instances of conduct to when character or character trait is essential element of charge or defense); *N.J.R.E.* 608(a) (opinion or reputation evidence to prove character for truthfulness). We examine the two rules defendants proffer in turn.

*N.J.R.E.* 404(b) "is a rule of exclusion rather than a rule of inclusion." *State v. P.S.*, 202 *N.J.* 232, 255, 997 *A.*2d 163 (2010). Under the rule, "evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." *N.J.R.E.* 404(b). However, "[s]uch evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." *Ibid.*

Defendants must satisfy a four-part test to introduce extrinsic evidence under the rule: "(1) The evidence of the other crime must be admissible as relevant to a material issue; (2) It must be similar in kind and reasonably close in time to the offense charged; (3) The evidence of the other crime must be clear and convincing; and (4) The probative value of the evidence must not be outweighed by its apparent prejudice." *State v. Cofield*, 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992) (citation omitted). The second part of the test is " 'limited to cases that replicate the circumstances in *Cofield*.' " *State v. Rose*, 206 *N.J.* 141, 160, 19 *A.*3d 985 (2011) (quoting *State v. Williams*, 190 *N.J.* 114, 131, 919 *A.*2d 90 (2007)).

Defendants cite *State v. Gookins*, 135 *N.J.* 42, 637 *A.*2d 1255 (1994), in support of their position. In that case, the Court set aside defendants' convictions for driving while under the influence of alcohol in light of newly discovered evidence that the arresting officer pled guilty to falsifying the results of a breathalyzer test in another case. *Id.* at 44, 47–48, 637 *A.*2d 1255. The Court concluded that defendants could use such clear and convincing evidence of intentional falsification to prove opportunity and the absence of mistake or accident under *N.J.R.E.* 404(b). *Id.* at 48, 637 *A.*2d 1255. The Court also cited principles of fundamental fairness in support of its decision. *Ibid.*

This case is a far cry from *Gookins*. A judge has already examined Trooper Acevedo's personnel file and found nothing discoverable in it. Evidence of other troopers' stops and how they were trained would have no bearing on Trooper Acevedo. Thus, rather than introduce clear and convincing proof of a criminal conviction, defendants might resort to data of the Trooper's prior stops to try to prove a pattern of prior wrongdoing. If that evidence exists, introducing it would lead to a mini-trial of substantial proportions on a collateral issue—as jurors heard evidence about the validity of individual, prior motor vehicle stops, and the credibility of the Trooper and other witnesses involved in those stops. Statistical evidence to prove a pattern of misconduct would

be even more difficult to confine. In the end, the trial might well encompass the equivalent of one or more suppression hearings on other stops, which would distract the jury and confuse the issues. *See Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230; *N.J.R.E.* 403. Thus, evidence of racial profiling discovery in this case would not be admissible against the arresting officer at trial under *N.J.R.E.* 404(b).

Defendants also rely on *N.J.R.E.* 608(b). That section carves out a narrow exception to the general rule against using specific instances of conduct to impeach a witness's character for truthfulness. The rule codified this Court's holding in *State v. Guenther,* 181 *N.J.* 129, 854 *A.*2d 308 (2004), and provides that

> [t]he credibility of a witness in a criminal case may be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged if the judge preliminarily determines, by a hearing pursuant to Rule 104(a), that the witness knowingly made the prior false accusation.
>
> [*N.J.R.E.* 608(b).]

Defendants must overcome several hurdles for the rule to apply. First, they concede that the Court would have to expand the scope of the current rule, which does not encompass the facts of this case. Defendants stand convicted of attempted murder; they seek racial profiling discovery to uncover a possible different false accusation: that the Trooper stopped drivers because of their race and fabricated the bases for those stops.

Second, *Guenther* emphasized that evidence of a prior false accusation "should be limited only to those circumstances in which the prior accusation has been shown to be false." *Guenther, supra,* 181 *N.J.* at 157, 854 *A.*2d 308. To determine whether such evidence is admissible, *Guenther* directs courts to examine, among other things, "the number of witnesses, the items of extrinsic evidence, and the amount of time required for presentation of the issue at trial." *Ibid.*

Once again, defendants here might seek to attack the Trooper's credibility by relying on raw data from his traffic stops and witnesses to some of the individual stops. As discussed

earlier, that type of presentation would devolve into a mini-trial on a collateral issue. Possible evidence of racial profiling would thus not be admissible under *N.J.R.E.* 608(b) either.

This Court rejected a more modest request to present evidence of prior police misconduct to the jury in *State v. Spivey,* 179 *N.J.* 229, 844 *A.*2d 512 (2004). The defendant in *Spivey* was on trial for possession of a firearm while possessing drugs with intent to distribute within 500 feet of a public park. *Id.* at 232, 234, 844 *A.*2d 512. In his defense, he sought to introduce evidence that one of the arresting officers "had previously assaulted and planted drugs on a defendant in an unrelated case tried several years earlier." *Id.* at 242, 844 *A.*2d 512. The Court affirmed the trial court's decision to bar that evidence for these reasons:

> Defendant wanted to call the allegedly abused defendant in the unrelated case in a naked attempt to introduce impermissible bad character testimony via a single alleged act of prior misconduct. The trial court recognized that defendant's request would require a mini-trial on a collateral issue. Additionally, defendant failed to articulate a justification for the admission of such evidence that, on its face, is prohibited by several rules of evidence. [Citing *N.J.R.E.* 608, 609, 405(a), and 404(b).] Defendant never explained to the trial court how his inquiry would comply with those rules. Moreover, the court barred the evidence because of its collateral nature and because any probative value it possessed was substantially outweighed by undue risk of prejudice and consumption of time. *N.J.R.E.* 403. We do not find any abuse of discretion by the trial court.
> [*Ibid.*]

If the broad discovery requested in this case turned up one or more witnesses, or statistical proof in the form of raw data, the above reasoning would apply with equal force. *Cf. State v. Franklin,* 384 *N.J.Super.* 306, 310–12, 894 *A.*2d 1154 (App.Div. 2006) (rejecting defendant's motion under *N.J.R.E.* 404(b) to introduce six-year-old evidence of misconduct by other members of police department to challenge undercover officer's credibility).

Up to this point, defendants have presented no evidence that they were stopped because of their race. They successfully sought access to the Trooper's personnel file before trial to uncover "bias, prejudice or a motive to fabricate." Over the State's objection, the trial court reviewed the file in camera and found "nothing whatsoever of a discoverable nature" in it. If they

were trying to suppress the cocaine found in their car at a *pretrial* hearing in a *drug* prosecution, or in an effort to get a new trial on drug charges, they would be entitled to additional discovery under *Ballard* and Judge Barisonek's orders. But they have offered no viable theory about how that evidence could be used *during* trial. And even if they discovered evidence of some probative value and persuasively cited a rule of evidence that supported its admission, the evidence would have to be weighed against the risk of undue prejudice, confusion of the issues, misleading of the jury, and the amount of time needed to present the evidence under *N.J.R.E.* 403.

At this point in the proceedings—nearly twenty years after the offense and almost seventeen years since the jury's verdict—defendants would face an additional obstacle in the future if their discovery request were granted. "To meet the standard for a new trial based on newly discovered evidence, defendant must show that the evidence ... 'would probably change the jury's verdict if a new trial were granted.'" *State v. Ways,* 180 *N.J.* 171, 187, 850 *A.*2d 440 (2004) (quoting *State v. Carter,* 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981)). Although we are not in a position to decide that question now, the evidence defendants hope to uncover would have to be evaluated in light of the strong corroborative proofs in the record that support the Trooper's testimony: the marks on his throat, hand, and elbow; the dirt on his uniform, shoes, and holster; the beaten-down grass; the mud on the back of Gonzalez's shirt; the Trooper's demeanor at the scene; and the defendants' respective post-arrest statements.

We conclude that defendants are not entitled to racial profiling discovery to challenge the Trooper's credibility at trial.

## VII.

For the reasons stated above, the judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—6.

*Opposed*—None.