**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5547-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LUQMAN ABDULLAH,

     Defendant-Appellant.

_____

Submitted September 17, 2019 – Decided  October 18, 2019

Before Judges Hoffman and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 09-10-0928.

The Anthony Pope Law Firm, PC, attorneys for appellant (Annette Verdesco and Eric William Feinberg, on the briefs).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Michele C. Buckley, Special Deputy Attorney General/Acting Assistant Prosecutor and Reana Garcia, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Luqman Abdullah appeals from his conviction on numerous charges following a jury trial. He also asserts error in the denial of a pre-trial suppression motion and challenges the sneak and peek warrant. After a review of the arguments in light of the record and applicable principles of law, we affirm.

## I.

### A.

We derive the facts from the evidence elicited at trial. In 2009, numerous law enforcement agencies in Union County, including the Federal Bureau of Investigation, began a joint narcotics investigation, targeting a suspected drug distribution network. A wiretap of a local drug dealer revealed the identities of the dealer's drug suppliers — one was Abdul Hassan. Defendant was observed at Hassan's residence. Further investigation disclosed defendant frequented several homes; he was often at his girlfriend's residence in Newark, his mother's home in Elizabeth and at his own residence in Sayreville. Defendant was observed driving numerous vehicles, only one of which was registered in his name.

2

Tracking devices on defendant's vehicles showed him frequently at an apartment building located on Chancellor Avenue in Newark. After police observed defendant enter the Chancellor Avenue parking lot several times, only remaining in the building ten to fifteen minutes, they suspected the residence was a "stash location," "a place where drugs were sold . . . or kept."

When law enforcement surveilled defendant, they noticed he was "extremely surveillance conscious" and would drive erratically, such as driving too fast, making "many lane changes," frequently stopping on the side of the road, and circling around the block numerous times. Elizabeth Police Detective Daniel Merten testified that "squaring of blocks" and stopping frequently on the side of the road normally indicates counter surveillance techniques used by people trying "to make sure they are not being followed."

Since the Chancellor Avenue residence was an apartment complex, law enforcement did not know which apartment was being used to manufacture and distribute drugs. A review of the electric bills for the entire complex showed apartment D2's bill was "unusually low," roughly ten dollars a month. In order to ascertain whether D2 was the correct apartment, an undercover detective walked into the building at the same time as Hassan, and observed him entering D2. As a result, law enforcement installed a camera in the hallway facing doors

D1, D2, and D3. This camera captured defendant at the Chancellor Avenue residence on April 12 and April 14, 2009.

Shortly thereafter, a detective for the Union County Prosecutor's Office sought legal authorization via a "sneak and peek"[1] in order "to plant . . . a 'bug' or a listening device" in apartment D2. A 127-page affidavit supported the application for the warrant. The search warrant was issued on April 17, 2009.

In the early morning hours of April 22, 2009, officers physically entered apartment D2. Once inside, law enforcement observed that "it appeared that no one was living there;" there was "little to no furniture," no toiletries, no silverware, no food, and no bed. As they entered the kitchen, they noticed there was powder covering the floor, the cupboards were open with "large rock-like substances in plastic bags," there was baking soda, Pyrex containers, a "scale with powder substance on it," knives and razor blades covered in powder, "[p]ackaging material, ziplock bags, plastic bags, [and] rubber gloves." Additionally, they saw white powder covering the stove. Although the officers believed they were witnessing the production of controlled dangerous substances (CDS), specifically cocaine, they did not do a "thorough and

---

[1] The detective described a "sneak and peek" as a "covert entry . . . into [an] apartment" where law enforcement "look[s] for a . . . position to place a listening device."

exhaustive search" for drugs as they were there to find a location to position the listening device.

During the sneak and peek, law enforcement also observed a rifle and a handgun in two different closets. The officers recorded what they saw upon entering the apartment for the purpose of determining where to place the listening device, however, the video also captured the evidence found in the room. A sample of the powder and a rubber glove were taken for testing.

Eleven hours after the search concluded, at 1:53 p.m. on April 22, 2009, defendant was observed leaving the apartment. He was also seen at the apartment at 12:00 p.m. on April 23. Later that evening, at approximately 7:30 p.m., police observed defendant leave apartment D2 and enter Hassan's Cadillac. The investigation ended that night after law enforcement became concerned that defendant and the other suspects were suspicious that they were being investigated.

Arrest warrants were issued for defendant and Hassan.[2] A team of detectives and state troopers located Hassan's car parked outside a restaurant. When defendant and Hassan came out of the restaurant, the officers "jumped out of the car," "rushed both individuals," screamed "[p]olice, freeze, get down on

---

[2] Twenty-four people were arrested as a result of the investigation.

the ground," "threw a distraction device down," used lights and sirens, and began a foot pursuit of the suspects.

As both men began to flee, the officers chased them, screaming, "[p]olice stop, police stop, you're under arrest." Defendant did not stop and law enforcement could not catch him. Hassan ran across the street, but then surrendered to police and was arrested.

That same night, law enforcement executed numerous search warrants for residences connected with defendant. During a search of his girlfriend's apartment, law enforcement found mail addressed to defendant, two cell phones, three pictures of defendant hidden in the refrigerator, and $5000 in cash in the living room closet.

The police also obtained a search warrant for apartment D2. They again noticed the scarce furnishings, only a couch and chair, and noted the apartment did not have a refrigerator, dishes, kitchen utensils, toiletries, or clothing in the closets.

During their search, the police found: a .45 caliber automatic firearm loaded with four rounds, a 7.62 x 39 rifle with two magazine clips and thirty-three rounds, a Ruger gun box, respirator masks, a prescription morphine bottle with seven pills, a plastic bag containing sixteen bricks and one bundle of

heroine, four plastic bags and four gloves, a .40 caliber firearm, a box of .9 millimeter Luger pistol cartridges with forty-five bullets, three Pyrex measuring cups, scales, ziplock bags containing suspected CDS, baking soda, a bottle of rum, a red lighter, knives, numerous black bags and paper plates, one kilo of suspected cocaine in two plastic bags, and numerous bags of a rock-like substance which was suspected to be cocaine. In a search of Hassan's residence, the police found: a box of checks in Hassan's name, Hassan's Visa card, Hassan's passport, keys to his vehicle, six empty holders for a cell phone's SIM card, seven new SIM cards in their holders, five cell phones, and $6011 in cash discovered in three different rooms in the home.

Police executed a no-knock search warrant for the Sayreville residence where they found defendant's insurance card, three cell phones, defendant's checkbook, defendant's BMW contract, defendant's driver's license, and $21,995 in cash hidden in two articles of clothing in the master bedroom closet and the hallway closet.

After searching apartment D2, law enforcement searched a vehicle associated with defendant that was parked at the building. The search produced: insurance papers issued to defendant, a Bank of America checkbook in defendant's name, receipts from BMW listing defendant as the customer, an

7

Alamo rental receipt listing defendant as the renter, contractor estimate papers in defendant's mother's name, and a dry cleaning receipt in defendant's name.

Testing on the seized materials from apartment D2 confirmed the substances were: 1.79 grams of morphine, 21.17 grams of heroin, and approximately 2,850 grams of cocaine. Fingerprints from Hassan and the other supplier were on numerous pieces of evidence. Defendant's fingerprint was found on one kilo wrapper.

The lab testing also determined defendant's DNA was a match with a water bottle and latex gloves found in the apartment. Of the twenty-eight gloves that were analyzed, all "either contained a [DNA] profile that was a match to [defendant] or a profile where he could not be excluded as a contributor."

B.

On September 24, 2009, five months after defendant had eluded police, Clifton police conducted a routine traffic stop and pulled over a Jeep Cherokee for improperly tinted windows. The police asked both the driver and passenger to step out of the car. The passenger was described as six feet tall, approximately 195 pounds, wearing a black shirt and a baseball cap, and had tattoos on both

elbows: a spider web on his left and dog tags on his right.[3]  The passenger was later identified as defendant.

When defendant asked to sit on the curb, the police agreed, but instead of sitting, defendant "took off running using the curb almost like a shuttle block." As defendant fled across Route 3, the baseball cap "flew off his head and dropped to the ground."  Defendant ran through six lanes of traffic, jumped over the four foot concrete barrier in the highway, ran through a gas station, and fled into a wooded area behind the highway.  The police were unable to catch up with him.  DNA testing on the baseball cap showed defendant's DNA was a match with the cap.

## II.

In October 2009, defendant was charged in an indictment with: first-degree racketeering, N.J.S.A. 2C:41-2(c) and 2C:41-2(d) (counts one and two); second-degree conspiracy, N.J.S.A. 2C:5-2 (count three); first-degree maintaining or operating a controlled dangerous substance production facility, N.J.S.A. 2C:35-4 (count four); third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1) (counts five, eight, and eleven); first-degree possession of a controlled dangerous substance with intent to

---

[3]  The parties stipulated at trial that defendant had these tattoos on his elbows.

distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(1) (count six); third-degree possession of a controlled dangerous substance with intent to distribute on or within 1,000 feet of school property, N.J.S.A. 2C:35-7 (counts seven and ten); third-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and 2C:35-5(b)(3) (count nine); second-degree unlawful possession of a weapon (assault firearm), N.J.S.A. 2C:39-5(f) (count twelve); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count thirteen); second-degree possession of a firearm in the course of committing a violation of N.J.S.A. 2C:35-5 and N.J.S.A. 2C:39-4.l(a) (count fourteen); third-degree receiving stolen property, N.J.S.A. 2C:20-7 (count fifteen); fourth-degree prohibited device, N.J.S.A. 2C:39-3(d) (count sixteen); third-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(a) (count seventeen); fourth-degree resisting arrest (by flight), N.J.S.A. 2C:29-2(a) (counts eighteen and twenty-two); third-degree hindering apprehension, N.J.S.A. 2C:29-3(a) (count nineteen); third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(a)(4) (count twenty); third-degree false

10

government documents, N.J.S.A. 2C:21-2.l(c) (count twenty-one); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (count twenty-three).[4]

On the same day, defendant was charged in a second indictment with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7. Three years later, in December 2012, defendant surrendered to the prosecutor's office.

III.

A.

Prior to trial, defense counsel filed a motion to suppress the evidence seized during the sneak and peek search, asserting law enforcement lacked probable cause to obtain the warrant.[5] The trial judge disagreed, noting that

> [the warrant judge is] looking for probable cause that . . . there are criminal activities that are happening in that particular apartment in that particular location and whether there's probable cause for that. And he's looking at the totality of the activities vis-à-vis that apartment, not just probable cause relating to . . . the defendant here.

Because the sneak and peek only required probable cause that the apartment had a connection to drug activity, the judge denied the suppression motion.

---

[4] Counts seven, ten, twenty-one, twenty-two, and twenty-three were dismissed before trial.

[5] The motion was originally filed as a motion to dismiss the indictment; counsel amended his request during argument on the application.

B.

In the seven years that elapsed between the investigation and trial, defendant's appearance dramatically changed. In 2009 defendant was described as having long dreadlocks, light facial hair, a muscular-athletic build, weighing 200 pounds, and six feet tall. In 2016, defendant had shorter hair without dreadlocks, a full beard that covered his chin, and "a slender build." As a result, the State sought to introduce police opinion testimony of defendant's identification.

During the ensuing Rule 104 hearing, the State produced Detective Vito Colacitti, the lead detective in the narcotics investigation. Colacitti stated he first became familiar with defendant through his law enforcement experience in 2000. Prior to the subject investigation, Colacitti had looked at arrest photographs of defendant, motor vehicle photographs and had seen him numerous times in person. Although defendant's appearance had changed in the seven years proceeding trial, Colacitti testified that his "facial features [were] exactly the same."

On cross-examination, Colacitti stated he had seen defendant "a dozen times" between 2002 and the time of the subject investigation. Those observations were all made while the detective was driving in a car performing

12

his duties as a member of the prosecutor's narcotics task force. After the subject investigation began, Colacitti said he physically observed defendant, in person, five times. He also intended to identify defendant to the jury on the surveillance videos.

On September 29, 2016, the trial judge issued an oral decision, finding the State could present opinion testimony through Colacitti to identify defendant. The judge distinguished this matter from State v. Lazo, 209 N.J. 9, 22-24 (2012), because here there was a "change of appearance." He explained that in Lazo, the Court found it was error to allow the detective to offer lay opinion testimony on the defendant's appearance because "the detective's ID was not based on prior knowledge . . . [he] had not witnessed the crime, did not know the defendant, [there was] no change in appearance, and the ID was based merely on the victim's description." Id. at 24. In contrast, the judge found here that Colacitti had personal knowledge of defendant's appearance during the narcotics investigation and had observed defendant in person and over surveillance footage "commit acts in furtherance of the crime while they were going on."

Therefore, the judge permitted Colacitti to testify about defendant's appearance during the investigation, his physical observations of defendant, the differences in defendant's appearance, and to discuss the videos "where he

13

actually [saw defendant's] facial features and [was] able . . . to identify [that the] person in the video [was] . . . defendant."

The judge precluded Colacitti from testifying about any observations or knowledge of defendant prior to the narcotics investigation because it was not relevant, exposed defendant to "significant [Rule] 403 issues," and "could potentially prejudice the defense on cross-examination."

## C.

The State also intended to introduce, under the attenuation doctrine, the baseball cap seized during the traffic stop in 2009. In the criminal case against the driver of the Jeep, the driver had moved to suppress the evidence seized during the stop. Although the judge[6] there determined the stop was proper, he found the subsequent warrantless search was unjustified under the circumstances. After the officers were satisfied that the Jeep was not stolen, the judge found they should have written a ticket and walked away. Therefore, the judge suppressed the evidence as to the driver of the car. Defendant here sought to suppress the baseball hat under the same premise.

---

[6] A different judge presided over the Jeep driver's suppression motion than the trial judge in this case.

A-5547-16T1

Although the trial judge here agreed with his colleague's determination regarding the constitutionality of the stop and subsequent search of the car, he found the prior decision had not addressed the attenuation doctrine. He stated that because the Jeep driver "did not do anything . . . to trigger any attenuation argument" as he was "totally cooperative" and "didn't run," the driver and defendant were "very differently situated" regarding attenuation. In addition, the State sought to use the hat as evidence against defendant, not the Jeep driver. As a result, an attenuation hearing was conducted.

The only witness to testify at the hearing was the Clifton police officer who had made the traffic stop. Following his testimony, in an oral decision on September 28, 2016, the trial judge found the attenuation doctrine required the denial of defendant's motion to suppress the baseball cap.

In making this determination, the judge considered the three factors set forth in State v. Herrerra, 211 N.J. 308, 331 (2012) (quoting State v. Johnson, 118 N.J. 639, 653 (1990)), to evaluate whether the seized hat was sufficiently attenuated from the taint of the unconstitutional search: "'(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the flagrancy and purpose of the police conduct.'"

15

Although the judge found the first factor weighed in favor of defendant, he concluded it was "substantially outweighed by the other two factors." The judge noted that eluding the police and resisting arrest in response to an unconstitutional stop was an intervening act. He also found the officers had acted in good faith in stopping the vehicle based on the traffic violation and also their observation of damage to the passenger door. He stated the officers then took further action because they believed the driver was covering up the smell of marijuana or involved in a theft. The judge found: "Although their beliefs were insufficient to continue their stop, their actions could hardly be described as flagrant misconduct."

As to intervening circumstances, the judge found defendant's actions in disobeying police commands to sit on the curb and to stop as he fled across six lanes of traffic and over a center barrier in heavy traffic "posed a risk of physical injury to police officers, members of the public, and defendant himself." The judge found the "significant intervening circumstances" supported the application of the attenuation doctrine and required the denial of the suppression motion.

D.

At the conclusion of the State's case, defendant moved for acquittal under State v. Reyes, 50 N.J. 454, 458-59 (1967). Defense counsel argued the State lacked proof to connect defendant to the crimes charged in the indictment. After hearing argument, the judge stated he was "satisfied under the Reyes standard that there[] [was] more than enough information to send all of the[] counts to the jury." The judge clarified he was not determining whether the State had proven its case beyond a reasonable doubt, but under the applicable standard, he believed there was "sufficient evidence that . . . defendant controlled . . . apartment [D2] and what was in it and was involved in this activity with at least . . . Hassan and . . . [the second drug supplier] and that there were repeated possessions with intent predicate acts."

E.

Prior to presenting his case, defense counsel sought to admit an invoice from a North Carolina Hilton Hotel to refute a police report prepared during the narcotics investigation that described surveillance of defendant on a particular day in a mall parking lot. The invoice showed defendant's credit card was used on that same day at the North Carolina hotel. The prosecution had not discussed

17

this day of surveillance in its direct case and the officer who prepared the report did not testify at trial.

Defendant sought to introduce the hotel invoice to establish he was in North Carolina at the time of the purported surveillance and, therefore, the police officer, and by extension, all of the law enforcement involved in the investigation, misidentified defendant. Counsel intended to call David Mast, an employee of Hilton Short Hills, to authenticate the invoice.

Counsel for Hilton and Mast explained to the court that Mast worked for a corporate Hilton in New Jersey and the North Carolina location was a franchise that may not have adopted the policies and procedures of the Hilton Corporation. With regard to the actual invoice, the Hilton counsel thought Mast could testify that it "look[ed] like a Hilton invoice," but he could not corroborate it came from the Charlotte, North Carolina Hilton.

In response, the State presented several arguments as to the relevancy and probative value of the invoice. In particular, the State contended there was no testimony that it was defendant himself who checked into the North Carolina hotel or that the person who checked in even presented any form of identification. Mast could not authenticate "whether ID was required or shown,

whose ID was shown, [or] whether the person who showed up is the same person who paid for the room."

The judge denied defendant's request to admit the invoice and precluded Mast's testimony because it was "very minimally probative and ha[d] the potential to lead to . . . confusion." He determined that Mast, as a Hilton employee in New Jersey, could not testify about any policies or procedures that were in place at the North Carolina Hilton franchise in 2009.

F.

During the charge conference, defendant requested the judge address his allegations regarding tampering of the evidence and defects in the chain of custody of evidence when charging the jury. Defense counsel proposed the following charge:[7]

> The defense has elicited testimony that with respect to the handling and storage of certain physical evidence the police without justification or explanation failed to follow police department protocol, and rules for the handling and storage of physical evidence, and for maintaining the integrity of the chain of custody which is necessary to assure the accuracy and validity of the evidence.

---

[7] The charge was not read into the record during the charge conference. Defense counsel read the proposed charge into the record during argument on his motion for a new trial.

[. . . .]

> If you find that the State has not met its burden in this regard and you are left with the finding that you are not reasonably certain that there was no alteration or modification of — or tampering with such evidence, then you may disregard and not consider such evidence in relation to your deliberations. And you may further conclude that the State's failure in this regard constitutes reasonable doubt as to the defendant's guilt.

The judge agreed it was appropriate to charge the jury on this issue, but disagreed with defense counsel's proposed language. He stated:

> I'm not giving that charge. I think it's -- I think it's covered elsewhere, and it's exactly what I had in mind when you had me strike portions of their charge when you said it sounds just like what their summation is going to be. It's not -- it's your -- most of this is covered elsewhere. The first half of it is covered elsewhere, and the second half of it is your summation.

The judge then read his charge to counsel. Defense counsel admitted that he "would prefer [his proposed] charge," but agreed to the judge's charge. Therefore, the judge instructed the jury:

> The defense has raised the issue of alleged defects in the chain of custody regarding kilo wrappers and gloves. You must determine whether there are such defects and the weight to give to such evidence. If you find there are any defects in the chain of custody, you may consider them in determining what weight to give to the testimony regarding the gloves and kilo wrappers. The State alleges that those items were in the same or substantially similar condition from when the

evidence was seized from 129 Chancellor Avenue, Apartment D2, until it was received by the laboratory.

Defense counsel did not object.

Defendant was found guilty on all counts on November 9, 2016.

III.

On December 12, 2016, the court and counsel received an anonymous letter purportedly written by a juror.[8]  In this letter, the writer stated that before the jury was charged, the jurors discussed the case at a restaurant, Googled defendant, and learned he was "a leader of a street gang."  Upon learning this information, the letter stated that several jurors were prejudiced against defendant and concluded that he was guilty.  Moreover, the letter stated that on one or two occasions, numerous jurors saw defendant wearing shackles and noted that "he looked darker and menacing while in handcuffs."  The letter concluded in stating the jurors should be recalled and questioned about their deliberations.  "Ms. Honest" signed the letter and listed a fictitious return address.  Subsequent testing of the letter showed no fingerprints on the envelope and insufficient DNA despite the letter being "licked and sealed shut."

---

[8]  The letter was not read into the record during the July 27, 2017 hearing on the motion for new trial.  Nor was it included in the record provided to this court. We, therefore, derive our information from counsels' argument and the trial judge's summary of its contents.

## A.

Defendant's motion for a new trial was heard on July 21, 2017. Defense counsel asserted the court erred by not using his proposed charge in the tampering of evidence and chain of custody jury instruction. He argued there was sufficient evidence to suggest law enforcement had tampered with the evidence seized at apartment D2. He reiterated there was no evidence to demonstrate defendant was involved in the drug operation, and therefore, he could not have been found guilty of racketeering. Additionally, defense counsel claimed the court erred in not recalling the jury and conducting a voir dire of the jurors after receiving the anonymous letter. Lastly, defense counsel argued the jurors were prejudiced against defendant because they saw him in handcuffs during the trial.

The trial judge began his ruling in addressing the letter. He noted it was anonymous, typed, undated, unsigned, and had a fictitious return address. After citing to a plethora of legal authority, the judge found the letter was unreliable and determined defendant had "not made the strong showing necessary to warrant the extraordinary procedure of post-trial interrogation of the []trial jurors."

A-5547-16T1

In considering defendant's argument that the jurors saw him in handcuffs, causing them to be prejudiced against him, the judge found the assertion was "not supported by anything in the record." He noted when defendant made the same allegation near the end of trial, the judge had determined there was no support for the assertion.

At that time, defense counsel informed the court that although he had not seen a juror view defendant in handcuffs, defendant told him he thought the jurors had seen him cuffed. In response, the judge explained it was "impossible" because the door to the hallway was always locked when defendant was brought in or out of the courtroom. Additionally, a sheriff's officer was stationed outside the jury room door during those times and the jurors were not permitted outside the room when defendant was in transit.

During his discussion of the issue following the motion for new trial, the judge explained that he, in addition to counsel, had reviewed the courtroom security footage, and particularly the segment where defendant alleged the jury had seen him in cuffs. With regard to that allegation, the judge described defendant as sitting at counsel table, which was about fifty feet from the jury room door. The video depicted defendant sitting in a high-chair, with his back to the jury room door. Based on "the distance, the angle, the high-back chair,

. . . [and] defendant's body blocking the view from anybody in the back of the [c]ourtoom," the judge concluded it was "impossible" for any juror in the jury room to have seen defendant in shackles. Additionally, the footage did not depict a juror near the door during this time; instead, it showed a sheriff's officer standing in the doorway. Therefore, he determined that no member of the jury had seen defendant in handcuffs.

The judge denied defendant's motion for a new trial, referring to his prior rulings and finding there was "enough evidence in the record to support the predicate racketeering acts." His ruling was memorialized in a September 8, 2017 order.

IV.

Defendant presents the following issues on appeal:

> I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL

> II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN DENYING APPELLANT'S MOTION FOR A JUDGMENT OF ACQUITTAL

> III. THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE STATE'S MOTION TO PERMIT OPINION TESTIMONY RELATING TO THE IDENTIFICATION OF APPELLANT

24

IV.  THE TRIAL COURT COMMITTED ERROR IN DENYING APPELLANT'S MOTION TO SUPPRESS THE BASEBALL HAT AS EVIDENCE IN THE CASE

V.  THE TRIAL COURT COMMITTED ERROR IN RULING THAT PROBABLE CAUSE EXISTED FOR THE SNEAK AND PEEK WARRANT

In defendant's supplemental pro se brief he argues:

I.  THE COURT'S FAILURE TO ARTICULATE ANY FINDINGS OR CONCLUSIONS OF LAW ON DEFENDANT'S SUPPRESSION MOTION, AND ADMISSION OF EVIDENCE OBTAINED AS A RESULT OF THE SNEAK AND PEEK WARRANT WHICH WAS NOT SUPPORTED BY PROBABLE CAUSE NOR STATUTORILY AUTHORIZED, WAS A VIOLATION OF THE FOURTH AMENDMENT, AND A DENIAL OF DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL THEREFORE THE CONVICTION SHOULD BE REVERSED

II.  THE PROSECUTOR'S USE OF A "SNEAK AND PEEK" SEARCH WARRANT AS A PRETEXT TO ESTABLISH PROBABLE CAUSE FOR SUBSEQUENT SEARCH AND ARREST WARRANTS CREATED AN APPEARANCE OF IMPROPRIETY AND AMOUNTED TO MISCONDUCT THAT DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL THEREFORE THE CONVICTION SHOULD BE REVERSED

A-5547-16T1

A.

We begin by addressing defendant's argument that probable cause was lacking for the sneak and peek warrant. It is well settled that there is "a presumption of validity with respect to the affidavit supporting the search warrant." State v. Broom-Smith, 406 N.J. Super. 228, 240 (App. Div. 2009) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)). Our "role is not to determine anew whether there was probable cause for issuance of the warrant, but rather, whether there is evidence to support the finding made by the warrant-issuing judge." State v. Chippero, 201 N.J. 14, 20-21 (2009). Therefore, "[w]e accord substantial deference to the discretionary determination resulting in the issuance of the [search] warrant." State v. Sullivan, 169 N.J. 204, 211-12 (2001) (alteration in original) (quoting State v. Marshall, 123 N.J. 1, 72 (1991)). It is defendant's "burden to prove that there was no probable cause [to support] the issuance of the warrant . . . ." State v. Keyes, 184 N.J. 541, 554 (2005) (internal quotation marks and citation omitted).

Probable cause is "consistently characterized . . . as a common-sense, practical standard for determining the validity of a search warrant." State v. Novembrino, 105 N.J. 95, 120 (1987). It is established when police have "'a well-grounded suspicion that a crime has been or is being committed.'" Sullivan,

169 N.J. at 211 (internal quotation marks omitted) (quoting State v. Waltz, 61 N.J. 83, 87 (1972)).

Here, we are satisfied that the 127-page affidavit presented in support of the warrant provided ample evidence to support probable cause for the issuance of a sneak and peek warrant. The affidavit detailed the surveillance techniques used by law enforcement, the wiretapped conversations in which the speakers discussed narcotics sales, apartment D2's uncharacteristically low electric bills indicative of a stash location, and defendant's and the drug suppliers' "frequent and short visits" to the Chancellor Avenue building where none of the three lived.

The affidavit sufficiently showed there was a "fair probability" and a "well-grounded suspicion" that criminal activity — the production of drugs — was occurring in apartment D2. See ibid.; State v. Demeter, 124 N.J. 374, 380-81 (1991). Under the substantial deference we accord to the warrant-issuing judge's finding, we are convinced there was sufficient evidence to support the sneak and peek warrant of apartment D2.

We likewise discern no error in the trial judge's denial of defendant's motion to suppress his baseball cap seized by the police after defendant fled from the traffic stop.

In reviewing a motion to suppress, we defer to the factual and credibility findings of the trial court, "'so long as those findings are supported by sufficient credible evidence in the record.'" State v. Coles, 218 N.J. 322, 342 (2014) (internal quotation marks omitted) (quoting State v. Hinton, 216 N.J. 211, 228 (2013)). Deference is afforded because the findings of the trial judge . . . are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy. State v. Reece, 222 N.J. 154, 166 (2015) (quotation marks and citations omitted).

Here, the trial judge found the police effectuated a valid traffic stop in 2009 but the subsequent warrantless search was not justified by the circumstances. However, the exclusionary rule will not require the suppression of the wrongfully-seized evidence if "'the connection between the unconstitutional police action and the secured evidence becomes so attenuated as to dissipate the taint from the unlawful conduct.'" State v. Shaw, 213 N.J. 398, 414 (2012) (internal quotation marks omitted) (quoting State v. Badessa,

185 N.J. 303, 311 (2005)). "[W]hen law enforcement officials secure evidence that is sufficiently independent of the illegal conduct — evidence that is not tainted by the misdeed — then withholding evidence from the trier of fact is a cost that may not be justified by the exclusionary rule." Ibid. (citing Badessa, 185 N.J. at 311).

To determine whether a seizure of evidence is sufficiently attenuated from an unlawful search, a court must consider three factors: "(1) 'the temporal proximity' between the illegal conduct and the challenged evidence; (2) 'the presence of intervening circumstances'; and (3) 'particularly, the purpose and flagrancy of the official misconduct.'" Id. at 415 (quoting Brown v. Illinois, 422 U.S. 590, 602-04 (1975)); accord State v. Williams, 192 N.J. 1, 15 (2007) (Williams I).

Here, an analysis of the three factors favors the State and supports the admission of the hat under the attenuation doctrine. Only the temporal proximity factor weighs in favor of defendant because the chase occurred a short time between the police ordering defendant out of the car and his subsequent flight. However, "temporal proximity 'is the least determinative' factor." Williams I, 192 N.J. at 16 (quoting State v. Worlock, 117 N.J. 596, 622-23 (1990)).

The third factor requires a showing of flagrant misconduct by the Clifton police. Both trial judges who considered the suppression of the evidence seized pursuant to the traffic stop found the police properly stopped the Jeep due to its tinted windows. The suppression motion judge believed "the officers should have written a ticket and just walked away" after confirming the car was not stolen. However, the failure to do so did not equate to flagrant misconduct. As our Supreme Court has stated, "[E]ven though the officers may have acted mistakenly, they did so in good faith." Williams I, 192 N.J. at 16. We see no evidence to the contrary.

With two factors in equipoise, the second factor, whether intervening events exist, becomes most significant to the analysis. See Worlock, 117 N.J. at 623 (holding that the presence of intervening criminal events is the most important factor in the attenuation analysis).

In State v. Williams, 410 N.J. Super. 549, 563 (App. Div. 2009) (Williams II) (quoting William I, 192 N.J. at 15), we considered whether there were "significant 'intervening circumstances'" that "posed a risk of physical injury to police officers and . . . members of the public." In that case, we noted the "defendant did not force the officers to engage in a lengthy and dangerous pursuit to apprehend him." Ibid.

30

Here, in total disregard for himself, the police and innocent bystanders, defendant ran across six lanes of heavy rush hour traffic, jumped over a center barrier and ran into a gas station and into the woods.

Defendant's actions placed himself, the Clifton police, motorists, and pedestrians in danger. See Williams I, 192 N.J. at 12-13 (recognizing "'any flight from police detention is fraught with the potential for violence because flight will incite a pursuit, which in turn will endanger the suspect, the police, and innocent bystanders'") (quoting State v. Crawley, 187 N.J. 440, 460 n.7 (2006)). We discern no abuse of discretion in the trial judge's finding of sufficient intervening acts between the traffic stop and the seizure of the baseball cap. The taint from the search was significantly attenuated by defendant's criminal flight leading to the seizure of his hat. The exclusionary rule is inapplicable under these circumstances.

C.

Because defendant's appearance dramatically changed in the seven years that elapsed between the narcotics investigation and defendant's trial, the State sought to introduce lay opinion testimony through Detective Colacitti. To the jurors, defendant was not readily identifiable as the man in the surveillance

31

videos. Therefore, the State wanted Colacitti to identify defendant as the person in the surveillance footage — proffering a lay opinion.

N.J.R.E. 701 permits a lay witness to give relevant opinion testimony if it is "rationally based on the perception of the witness and . . . will assist in understanding the witness' testimony or in determining a fact in issue." A police officer is permitted to testify as a lay witness when his or her opinions are based on personal observations and experiences. State v. LaBrutto, 114 N.J. 187, 198 (1989).

In Lazo, the Supreme Court found it error for a detective to testify that he believed the defendant closely resembled a composite sketch of a suspect because his lay opinion was not based on any prior knowledge. 209 N.J. at 24. The detective did not know the defendant and had not witnessed the crime; his opinion was based entirely on the victim's description of the suspect. Ibid. There also was no change in the defendant's appearance so the jurors did not need clarification from the officer that it was the defendant. Ibid. The Court stated the jury could compare the photo and composite sketch itself. Ibid.

In evaluating whether a law enforcement officer could present lay opinion testimony on the issue of identification, the Court looked to other jurisdictions and offered several factors for a trial judge's consideration. One factor was

"'whether the witness knew the defendant over time and in a variety of circumstances.  Id. at 22 (quoting United States v. Beck, 418 F.3d 1008, 1015 (9th Cir. 2005))'".  A second factor was "whether there are additional witnesses available to identify the defendant at trial."  Ibid. (citing United States v. Butcher, 557 F.2d 666, 670 (9th Cir. 1977)); State v. Carbone, 180 N.J. Super. 95, 97-100 (Law Div. 1981).

We see no abuse of discretion in the trial judge's determination to permit Colacitti to identify defendant in the surveillance videos.  Colacitti had a long history of observing defendant, both in person and via surveillance footage.  As the lead detective for the narcotics investigation, he reviewed live surveillance footage, arrest photographs, motor vehicle photographs, and personally observed defendant five times.

Colacitti was familiar with defendant's appearance in 2009.  He testified that even though defendant's appearance had changed in the seven years preceding trial, his "facial features [were] exactly the same."  We are satisfied Colacitti had sufficient prior interactions with defendant to allow him to identify defendant.

The trial judge permitted Colacitti to describe defendant's appearance during the investigation, his physical observations of defendant, and the

differences in defendant's appearance between the investigation and trial. He also permitted the detective to identify defendant in the surveillance videos, which Colacitti said he could do based on defendant's facial expressions and distinctive walk. His testimony was proper as it was based on his first-hand knowledge.

Defendant also argues it was error for the judge to permit other law enforcement officers to identify defendant in surveillance footage and comment on his changed appearance. There was no objection to the officers' testimony at trial and therefore we review defendant's assertions for plain error. R. 2:10-2.

In response, the State asserts those officers were introduced as fact witnesses, who did not offer opinion testimony. See N.J.R.E. 602 (requiring non-expert witnesses to confine their testimony to matters of personal knowledge). Rather, the officers simply described the surveillance footage on the days they observed defendant.

We find defendant's argument meritless. The officers testified as fact witnesses. Two detectives described the surveillance footage taken during their physical surveillance of defendant. Neither offered any opinion testimony. Two other officers also testified regarding their surveillance of defendant. They identified defendant in the courtroom and described the differences in his

appearance. These comments were based on their prior personal observations of defendant. Their testimony was not "clearly capable of producing an unjust result." R. 2:10-2.

D.

We briefly address defendant's assertion of error in the denial of his motion for acquittal. Like the trial court, "[w]hen evaluating motions to acquit based on insufficient evidence, [we] must view the totality of evidence, be it direct or circumstantial, in the light most favorable to the State." State v. Perez, 177 N.J. 540, 549 (2003). The State is entitled to "'the benefit of all its favorable testimony as well as of the favorable inferences [that] reasonably could be drawn therefrom.'" Ibid. (alterations in original) (quoting State v. Reyes, 50 N.J. 454, 459 (1967)). Such evidence is sufficient if it would enable a reasonable jury to find that the accused is guilty of the crime or crimes charged beyond a reasonable doubt. Ibid.

At the close of the State's case, defendant asserted (1) there was insufficient evidence to prove he was involved in a racketeering enterprise or pattern of activity, because the State failed to produce a witness to testify that defendant distributed narcotics; (2) the State failed to establish all the necessary

35

elements of maintaining or operating a CDS production facility; and (3) there was insufficient evidence to charge defendant with weapons offenses.

The State presented surveillance footage of defendant frequenting the Chancellor Avenue residence for mere minutes, the evidence seized from apartment D2 including defendant's DNA on a water bottle, and the abundance of cash and numerous burner phones found at his home. Additionally, the State presented an expert on narcotics production and distribution. In his testimony, he discussed street-level, mid-level, and upper-level narcotics sales, the different forms of cocaine, the different types of packaging, the price, the physical description of a kilogram of drugs, the description of a location used solely for packaging drugs, the presence of face masks and latex gloves when dealing with drugs, and opined that people who distribute drugs usually use multiple cell phones and have a "stash location," and that transactions are done with cash.

There was ample evidence recovered by the police pursuant to the search warrants for a reasonable juror to find defendant guilty of the charged offenses of operating or maintaining a CDS production facility and weapons offenses. In addition, the narcotics expert advised the evidence recovered at the apartment

included materials commonly used to distribute narcotics.  It was not error to deny the motion for acquittal.

E.

Lastly, we turn to the argument that it was error to deny the motion for new trial.  Defendant asserts a new trial is warranted because there was insufficient evidence to support the racketeering charges, the judge erred in charging the jury and denying admission of the Hilton invoice, and the jurors were prejudiced by seeing defendant in handcuffs.  Defendant also contends the trial judge was required to recall the jurors after receiving the anonymous letter, and conduct a voir dire examination to determine whether the verdict was tainted.

"'[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown.'"  State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (alteration in original) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)).  In determining whether a miscarriage of justice has occurred, we defer to the trial court on matters not transmitted by the record, such as credibility, demeanor, and the feel of the case.  State v. Gaikwad, 349 N.J. Super. 62, 82-83 (App. Div. 2002).  "There is no 'miscarriage of justice'

37

when 'any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" State v. Jackson, 211 N.J. 394, 413-14 (2012) (quoting State v. Afanador, 134 N.J. 162, 178 (1993)). Our application of this standard leaves us unpersuaded by defendant's arguments.

As stated earlier, the State presented sufficient evidence to substantiate convictions on the racketeering charges. The evidence presented of defendant entering and exiting apartment D2 in addition to the cash and burner phones found at his residences indicates he was involved in the narcotics enterprise. The officers need not have physically seen defendant distribute or sell the drugs. See State v. Ball, 141 N.J. 142, 175 (1995) (holding a defendant can be found to have participated in an enterprise even if his role "do[es] not exert control or direction over the affairs of the enterprise, as long as the actor, directly or indirectly, knowingly seeks to carry out, assist, or further the operations of the enterprise or otherwise seeks to implement or execute managerial or supervisory decisions").

We need only briefly discuss the contention regarding the jury charge. During the charge conference, defense counsel advocated for a more specific tampering charge. The judge declined counsel's proposed charge, finding it was

argument and not the pertinent law. Defense counsel then agreed to the judge's charge. The trial judge was not "bound to utilize the language" requested by defense counsel. State v. Green, 86 N.J. 281, 290 (1981) (citing State v. Thompson, 59 N.J. 396, 411 (1971)). Without an objection, we review the charge for plain error, and see none.

We next consider whether it was error to deny admission of the Hilton invoice. Defendant argues the document went "to the heart of [his] defense . . . that [he] was mis-identified in surveillance" and the State took "far-reaching efforts . . . to implicate him in the crimes charge[d]." We see no abuse of discretion in the trial judge's evidentiary ruling.

Defendant was unable to authenticate the invoice. The proposed witness worked at a Hilton corporate office in New Jersey. The invoice was purportedly from a North Carolina Hilton franchise. The witness could not testify to the procedures used during booking or checking into the North Carolina hotel. There was no evidence to substantiate it was defendant who actually checked into and stayed in the room. We see no reason to disturb the judge's conclusion that the invoice was "minimally probative and had the potential to lead to . . . confusion."

A-5547-16T1

We turn to the anonymous letter sent several weeks after the verdict. Defendant contends the information in the letter required the trial judge to recall the jurors and conduct a voir dire examination to determine if their verdict was tainted. We disagree.

Defendant contends he was prejudiced when the jury saw him in handcuffs and when some jurors learned from an internet search that he was the leader of a street gang.

"[A] criminal defendant's right to a fair trial requires that he be tried before a jury panel not tainted by prejudice." State v. Biegenwald, 106 N.J. 13, 32 (1987) (citing Irvin v. Dowd, 366 U.S. 717, 722 (1961)). A new trial must be granted when improper influence "'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" State v. Weiler, 211 N.J. Super. 602, 610 (App. Div. 1986) (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)). Such improper influence may include instances when jurors view a defendant in restraints. State v. Kuchera, 198 N.J. 482, 496-97 (2009); State v. Damon, 286 N.J. Super. 492, 497-98 (App. Div. 1996). Because "the trial court is in the best position to determine whether the jury has been tainted[,]" we apply an abuse of discretion

standard of review to challenges to the integrity of jury deliberations.  State v. R.D., 169 N.J. 551, 559 (2001).

During deliberations, defense counsel told the judge that defendant thought the jurors had seen him with handcuffs on, although counsel had not witnessed that.  No further information was provided, such as when this occurred or which jurors may have seen defendant cuffed.

The trial judge advised defendant it would have been "impossible" for any juror to see him in handcuffs because the door to the hallway was always locked when defendant was brought in or out of the courtroom.  A sheriff's officer was stationed outside the jury room door during these times and the jury was not permitted outside the room when defendant was in transit.

The anonymous letter raised this issue again, stating that on one or two occasions, jurors saw defendant wearing shackles and "he looked darker and more menacing while in handcuffs."  In response, the trial judge reiterated his courtroom procedures.  He also reviewed the court surveillance footage with counsel.  Over the three months of trial, the judge stated he only saw a glance of defendant's handcuffs for a "matter of seconds."  However, when considering the distance from defendant's seat to the jury room, the judge was confident defendant could not be seen by the jurors.  Moreover, at the specific time viewed

41

in the footage, a sheriff's officer was standing in the jury room doorway; no jurors could be seen.

In deference to the trial judge's "unique perspective," id. at 559-60, and his thorough review and consideration of this issue, we see no reason to disturb his decision that denied a new trial and the request to recall the jury.

The anonymous letter also failed to demonstrate the required "strong showing that [defendant] may have been harmed by jury misconduct." State v. Athorn, 46 N.J. 247, 250 (1966). The information provided here were hearsay statements in an anonymous letter bearing a fictitious return address.

Our courts have been wary of implementing the extraordinary remedy of conducting post-verdict interviews under those circumstances. See State v. Koedatich, 112 N.J. 225, 289 (1988) (denying post-verdict interviews because the information was not a reliable juror affidavit and "the contents of a single newspaper article, indisputably hearsay, [could not] be the sole basis for the extraordinary procedure of a post-trial jury interrogation."); see also State v. Freeman, 223 N.J. Super. 92, 120 (App. Div. 1988) (explaining a non-juror's letter discussing a juror's statement was "at best hearsay," which did not "provide good cause for post-verdict interrogation of jurors."); State v. DiFrisco, 174 N.J. 195, 242 (2002) (holding the unreliable hearsay "statements of an

alternate juror as conveyed through PCR counsel's affidavit" was insufficient "to warrant the extraordinary procedure" of interviewing the jurors post-verdict).

Presented with only an unreliable and anonymous letter, the trial judge did not abuse his discretion in declining to exercise the very extraordinary remedy of recalling the jury. Defendant has not demonstrated any bases upon which to grant a new trial.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5547-16T1